ORIGINAL

AO 93 (Rev. 12/09) Search and Seizure Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT

for the
Central District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
229 ½ E 30th Street
Los Angeles, California 90011

Case No. 17MJ00259

FILED
2017 MAY -2 AM 11:14
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before 14 days from the date of its issuance *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10 p.m. ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
*(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for ______ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of ______.

Date and time issued: 2/8/2017 1:14 p.m. — *Judge's signature*: [signature]

City and state: Los Angeles, CA — Hon. Alexander F. MacKinnon, U.S. Magistrate Judge *(Printed name and title)*

AUSA: JOEY L. BLANCH

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| 17MJ 259 | 2/9/17 605 Am | Fernando Garcia |

Inventory made in the presence of: Fernando Garcia

Inventory of the property taken and name of any person(s) seized:

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

see attached DHS form 6051 listing the items seized

**Certification** (by officer present during the execution of the warrant)

*I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.*

Date: 5/2/17

[signature]
Executing officer's signature

Timothy Ahn / Special Agent
Printed name and title

AUSA: JOEY L. BLANCH

DEPARTMENT OF HOMELAND SECURITY

No. 7213008

# CUSTODY RECEIPT for SEIZED PROPERTY and EVIDENCE

Handbook 5200-09

| | |
|---|---|
| 1. FPF No. 2017270400 | 2. Incident No. 201752 |
| 3. Investigative Case No. LA07QR17LA0001A | 4. Enforce No. |
| 5. Prior Detention? Yes ☐ No ☒ If yes, DHS 6051D No. ______ | 6. Date Seized (mm/dd/yyyy) 02/09/2017 — 7. Time Seized (Use 24 Hrs) 0610 — 8. FDIN/Misc. |
| 9. Seized From: Name: FERNANDO GARCIA<br>Address: 229 1/2 E. 30th ST. LOS ANGELES, CA 90011<br>Telephone No. ( ) Ext: | 10. Entry No. — 11. Seal or Other ID Nos.<br>12. Remarks: |
| 13. Send Correspondence to: | |

14. **PROPERTY** ( By Line Item) Attach DHS Form 58 if conveyance

| a. Line Item No. | b. Description | c. Packages Number | Type | d. Measurements Qty. | UM | e. Est. Dom. Value |
|---|---|---|---|---|---|---|
| 001 | PLAYSTATION 4 S/N# MB731134968 | 1 | BG | 1 | EA | $ |
| 002 | SAMSUNG GALAXY S5 CELLPHONE | 1 | BG | 1 | EA | $ |
| 003 | SILVER LG CELLPHONE | 1 | BG | 1 | EA | $ |
| 004 | WHITE AMGOO CELLPHONE | 1 | BG | 1 | EA | $ |
| 005 | TOSHIBA EXT HD S/N# 7458T9RATI9B | 1 | BG | 1 | EA | $ |
| 006 | SEAGATE EXT HD S/N# NA1G953F | 1 | BG | 1 | EA | $ |

15. Seizing Officer

Print Name: Timothy Alou  x Signature: [signature]  Date: 2/9/17

16. **ACCEPTANCE / CHAIN OF CUSTODY**

| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
|---|---|---|---|---|
| 1-28 | SEE ABOVE | DHS HSI SA GORDON KWAN | [signature] | 2/9/17 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS Form 6051A Continuation Sheet Attached? Yes ☒ No ☐

DHS retains original

Previous editions are obsolete

DHS Form 6051S (08/09)

[initials] 4/4/17

DEPARTMENT OF HOMELAND SECURITY

## CUSTODY RECEIPT FOR DETAINED OR SEIZED PROPERTY
**Continuation Sheet**

Handbook 5200-09

1. Page 2 of 4
2. DHS Form 6051S or D No. 7213008

| 3. FPF Number | 4. Investigative Case Number or IA File Number |
|---|---|
| 2017270400 | LA07QR17LA0014 |

This item seized

**5. PROPERTY** (By Line Item) Attach DHS Form 58 if conveyance — **FOR DETENTIONS ONLY**

| a. Line Item No. | b. Description | c. Packages Number | c. Packages Type | d. Measurements Qty. | d. Measurements UM | e. Est. Dom. Value | f. Samples sent to DHS Lab | f. Date |
|---|---|---|---|---|---|---|---|---|
| 007 | S/N# NA5K6Y27 SEAGATE EXT HD | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 008 | S/N# NA534JM7 SEAGATE EXT HD | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| ~~009~~ | ~~CD's~~ OK | ~~1~~ | ~~BG~~ | ~~162~~ | ~~EA~~ | $ | Yes ☐ No ☐ | / / |
| 009 | S/N: 1754FAR5895 EMACHINES LAPTOP | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 010 | S/N #2GEX49G1 SEAGATE EXT HD | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 011 | PLAYSTATION 3 | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 012 | KYOCERA CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 013 | COOLPAD CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 014 | MOTOROLA CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 015 | SAMSUNG CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 016 | HUAWEI CELL PHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |

**6. ACCEPTANCE/CHAIN OF CUSTODY**

| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS retains original
Previous editions are obsolete

DEPARTMENT OF HOMELAND SECURITY

## CUSTODY RECEIPT FOR DETAINED OR SEIZED PROPERTY

**Continuation Sheet**

Handbook 5200-09

1. Page 3 of ~~3~~ 4
2. DHS Form 6051S or D No. 7213008

3. FPF Number: 2017270400

4. Investigative Case Number or IA File Number: LA07QR17LA0014

**5. PROPERTY** (By Line Item) Attach DHS Form 58 if conveyance — **FOR DETENTIONS ONLY**

| a. Line Item No. | b. Description | c. Packages Number | c. Packages Type | d. Measurements Qty. | d. Measurements UM | e. Est. Dom. Value | f. Samples sent to DHS Lab | Date |
|---|---|---|---|---|---|---|---|---|
| 017 | SAMSUNG TABLET | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 018 | APPLE IPOD 32GB | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 019 | ALCATEL ONETOUCH CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 020 | 54 SN# APPLE IPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 021 | 55 SN# 579C-E2430A APPLE IPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 022 | APPLE IPOD 16GB | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 023 | LG CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 024 | MOTOROLA CELLPHONE | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 025 | WD HD 160GB | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 026 | WD HD 500GB | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| 027 | HGST HD 500GB | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |

**6. ACCEPTANCE/CHAIN OF CUSTODY**

| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS retains original
Previous editions are obsolete

DHS Form 6051A (08/09)

JJ 4/14/17

DEPARTMENT OF HOMELAND SECURITY

**CUSTODY RECEIPT FOR DETAINED OR SEIZED PROPERTY**
**Continuation Sheet**

Handbook 5200-09

1. Page 4 of 4

2. DHS Form 6051S or D No. 7213008

| 3. FPF Number | 4. Investigative Case Number or IA File Number |
|---|---|
| 2017270400 | LA07QR17LA0014 |

5. **PROPERTY** (By Line Item) Attach DHS Form 58 if conveyance — **FOR DETENTIONS ONLY**

| a. Line Item No. | b. Description | c. Packages Number | c. Packages Type | d. Measurements Qty. | d. Measurements UM | e. Est. Dom. Value | f. Samples sent to DHS Lab | f. Date |
|---|---|---|---|---|---|---|---|---|
| 028 | HITACHI HD 3GB | 1 | BG | 1 | EA | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |
| | | | | | | $ | Yes ☐ No ☐ | / / |

6. **ACCEPTANCE/CHAIN OF CUSTODY**

| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS retains original
Previous editions are obsolete

DHS Form 6051A (08/09)

**ATTACHMENT A**

PREMISES TO BE SEARCHED

The premises to be searched is the apartment located at 229 ½ E 30th Street, Los Angeles, California 90011 (the "SUBJECT REMISES"). This address is in an apartment complex located on E 30th Street between Maple Avenue to the east and S Main Street to the west. Directly in front of the apartment complex containing the SUBJECT PREMISES is another apartment complex with an address of 231 E 30th street, Los Angeles. The front apartment complex is brown in color, multi-story and is adjacent to E 30th street. Facing this apartment complex, there is a driveway on the left hand side leading to an unlocked brown gate. On the exterior wall of the front apartment complex adjacent to the driveway is a sign that has an arrow pointing towards the back with the number "229."

The rear apartment complex containing the SUBJECT PREMISES has three units. A set of weathered concrete stairs and brown railings leads to a brown tiled patio area containing the front doors of the three units. The door frame for the SUBJECT PREMISES has the number "229 1/2" on it. Both the number and door frame are dark brown. The SUBJECT PREMISES includes any parking or storage space exclusively assigned to apartment "229 ½."

**ATTACHMENT B**

ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child pornography), namely:

a. Child pornography, as defined in Title 18, United States Code, Section 2256(8).

b. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in Title 18, United States Code, Section 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in Title 18, United States Code, Section 2256.

d. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in Title 18, United States Code, Section 2256.

e. Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

f. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to P2P file sharing software.

g. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

h. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession of the "SUBJECT PREMISES".

i. Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, regarding ownership and/or possession and/or use of any digital device(s) found inside the SUBJECT PREMISES.

j. Any digital device used to facilitate the above-listed violations and forensic copies thereof.

k. With respect to any digital device used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

**[Instrumentality Protocol]**

i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**[Instrumentality Protocol]**

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones;digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II. SEARCH PROCEDURE FOR DIGITAL DEVICES

4. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a. Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The

government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The team searching the digital data also may use sophisticated tools, such as forensic hashing tools, to identify child pornography (including, but not limited to, "Encase" and "Forensic Tool Kit," or "FTK"). Forensic hashing is the process of using a mathematical function, often called an algorithm, to generate a numerical identifier for data (such as a particular file). If the data is changed, even very slightly (such as the addition or deletion of a comma or a period), the identifier should change. A hash value can be thought of as a "digital fingerprint" for data. The team searching digital devices in this case will also use a "hash set," which contains the hash values of image and video files associated with known identified victims of child pornography to determine whether these files are stored within a digital devices. Because this "hash set" is constantly being updated as investigations result in the rescue of children depicted in child pornography images/videos, it will not contain the hash

values of all currently identified image and video files. The team searching the digital devices will only use search protocols specifically selected to identify items to be seized under this warrant.

c. When searching a digital device pursuant to the specific search protocols selected, the search team shall make and retain notes regarding how the search was conducted pursuant to the selected protocols.

d. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

e. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

f. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

g. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them (after the time for searching the device has expired) absent further court order.

**[Instrumentality Protocol]**

h. The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending). Otherwise, the government must return the device.

i. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5. In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a. Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

b. Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c. Any magnetic, electronic, or optical storage device capable of storing digital data;

d. Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e. Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f. Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Timothy Alon, being duly sworn, do hereby depose and state:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 1995. My responsibilities with the FBI include investigations into the sexual exploitation of children and child pornography in the Central District of California. The FBI is responsible for enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. § 2251 et seq. During my tenure with the FBI, I have conducted and participated in numerous investigations of criminal activity, including at least 300 investigations in which targets have exploited children using the Internet, typically by transmitting child pornography using computers connected to the Internet. During my investigations in these cases, I have participated in the execution of at least 300 search warrants in which evidence of these violations was seized. I am currently assigned to the Child Exploitation Investigations Group ("CEIG"), which is a task force specifically dedicated to investigating and combating child exploitation. The CEIG task force is operated by the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI").

2. Through my training and experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children. I have attended training classes and seminars addressing computer crimes and the sexual exploitation of children on the Internet. This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses. My experience in investigations in this regard has supplemented my

understanding of how people involved in offenses relating to the sexual exploitation of children use the Internet to further those offenses.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of an application for a warrant to search the premises located at 229 1/2 E 30th St, Los Angeles, CA 90011 (the "SUBJECT PREMISES") more fully described in Attachment A, which is attached hereto and incorporated herein by reference, and to seize evidence, fruits, and instrumentalities, as specified in Attachment B, which is also attached hereto and incorporated by reference, of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child pornography).

4. The facts set forth in this affidavit are based upon my personal observations and training and, where noted, information related to me by other law enforcement officials and witnesses. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.

## III. SUMMARY OF INVESTIGATION

5. Along with other members of law enforcement, I have been investigating individuals who are trading child pornography on the Internet through peer-to-peer filing-sharing programs. As set forth in greater detail below, in May and June 2016, I used a peer-to-peer program to download images of suspected child pornography. These images were publically available for download to any Internet user with compatible peer-to-peer file-sharing software, which is available free over the Internet. The IP address of the computer offering the suspected child pornography is assigned to the SUBJECT PREMISES. Thus, I submit that there is probable cause to believe that the SUBJECT PREMISES contains evidence, contraband, fruits,

and instrumentalities of criminal activity in violation of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child pornography).

## IV. DEFINITION OF TERMS

6. The following terms have the indicated meaning in this affidavit:

a. The terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in Title 18, United States Code, Section 2256.

b. The term "computer" is defined as set forth in Title 18, United States Code, Section 1030(e)(1).

c. The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

d. The term "Internet Protocol" ("IP") is defined as the primary protocol upon which the Internet is based. IP allows a packet of information to travel through multiple networks (groups of linked computers) on the way to its ultimate destination.

e. The term "IP Address" is defined as a unique number assigned to each computer directly connected to the Internet (for example, 172.191.142.150). Each computer connected to the Internet is assigned a unique IP address while it is connected. The IP address

for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP address is only assigned for the duration of that online session.

f. The term "Internet Service Provider" ("ISP") is defined as a business that allows a user to dial into or link through its computers thereby allowing the user to connect to the Internet for a fee. ISPs generally provide only an Internet connection, an electronic mail address, and maybe Internet browsing software. A user can also connect to the Internet through a commercial online service such as AT&T, Verizon, or Time Warner Cable. With this kind of connection, the user gets Internet access and the proprietary features offered by the online service, such as chat rooms and searchable databases.

g. The term "peer-to-peer" ("P2P") has come to describe applications or programs that allow users to exchange files with each other directly or through a mediating server, via the Internet.[1] A decentralized peer-to-peer file transfer network does not follow a model using different clients or servers; but, rather, it is a network of equal peer computers that simultaneously function as both "clients" and "servers" to the other users on the same network.

h. The term "open source" is defined as software that includes a free license; in other words, it is freely available to everyone using the Internet.

i. The term "share folder," in the context of P2P software, is a folder or directory on a computer's hard drive, which a P2P user can set up to share his/her contents with other computers on a peer-to-peer network.

---

[1] A computer that is performing tasks for other computers that are connected to it is often called a "server." A "client" computer is one that is connected to a server and is making requests of the server.

j. The term "browsing" is used in reference to peer-to-peer networks, refers to the ability of a P2P user to look at or browse the shared files of another P2P user.

k. The terms "jpeg," "jpg," "gif," "bmp," and "art" are defined as graphic image files, namely, pictures.

l. The terms "mpeg," "mpg," "mov," "avi," "rm," and "wmv" are defined as video or movie files. To use these video files, one needs a personal computer or other digital devices with sufficient processor speed, internal memory, and hard disk space to handle and play typically large video files. One also needs a video file viewer or client software that plays video files. One can download shareware or commercial video players from numerous sites on the Internet.

## V. BACKGROUND ON USE OF COMPUTERS, CHILD PORNOGRAPHY, AND PEER-TO-PEER FILE SHARING TECHNOLOGY

7. Based upon my training and experience in the investigation of child pornography and with peer-to-peer file sharing programs, and information related to me by other law enforcement officers involved in the investigation of child pornography generally, I know the following information about the use of computers and child pornography.

8. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can scan these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

9. A growing phenomenon on the Internet is peer to peer ("P2P") file sharing. P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. A user first obtains the P2P software, which can be downloaded from the Internet. In general, P2P software allows the user to set up file(s) on a computer to be shared with others running compatible P2P software. A user obtains files by opening the P2P software on the user's computer, and conducting a search for files currently being shared on the network. Ares, one type of P2P software, sets up its searches by keywords. The results of a keyword search are displayed to the user. The user then selects file(s) from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) sharing the file.

10. For example, a person interested in obtaining child pornographic images would open the P2P application on his/her computer and conduct a keyword search for files using a term such as "preteen sex." The search is sent out over the network of computers using compatible P2P software. The results of the search are returned to the user's computer and displayed. The user selects from the results displayed the file he/she wants to download. The file is downloaded directly from the computer sharing the file. The downloaded file is stored in the area previously designated by the user and/or the software. The downloaded file will remain until moved or deleted.

11. One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel. This means that the user can download more than one file at a time. In addition, a user may download parts of one file from more than one source computer at a time. For example, an Ares user downloading an image file may actually receive parts of the image

from multiple computers. The advantage of this is that it speeds up the time it takes to download the file. Often, however, a user downloading a file receives the entire file from one computer.

12. The Ares network bases its file shares on the Secure Hash Algorithm ("SHA1"). This mathematical algorithm allows for the fingerprinting of files. Once a user checks a file with a SHA1 hashing utility capable of generating this SHA1 value (the fingerprint), that value will be a fixed-length unique identifier for that file. The SHA1 hash is the current Federal Information Processing and Digital Signature Algorithm. The SHA1 is called secure because it is computationally infeasible for two files with different content to have the same SHA1 hash value.

13. A P2P file transfer is assisted by reference to an IP address. This address, expressed as four numbers separated by decimal points, is unique to a particular computer during an online session. The IP address provides a unique location, making it possible for data to be transferred between computers.

14. The computer running the file sharing application, in this case Ares, has an IP address assigned to it while it is on the internet. Investigators can see the IP address of any computer system sharing files. Investigators can then search public records (i.e., the American Registry of Internet Numbers at www.arin.net) that are available on the internet to determine the internet service provider who has assigned that IP address. Based upon the IP address assigned to the computer sharing files, subscriber information can be obtained from the internet service provider.

15. I learned the following from attending the Ares law enforcement software course, regarding the Ares file sharing network:

a. I know from my training and experience that P2P networks are frequently used in the trading of child pornography. The "Ares" network is being used to trade digital files, including still images and movie files of child pornography.

b. The Ares network is an open source public file-sharing network. Most computers that are part of this network are referred to as nodes. A node can simultaneously provide files to some peers while downloading files from other nodes. Nodes may be elevated to temporary indexing servers referred to as "supernodes." Supernodes increase the efficiency of the Ares network by maintaining an index of the contents of network peers. Ares users query supernodes for files and are directed to one or more peers sharing that file. There are many supernodes on the network; if one shuts down, the network continues to operate.

c. The Ares network can be accessed by computers running many different client programs, including the original Ares Galaxy program, as well as derivatives compiled from the source code, which is open source and freely available. These programs share common protocols for network access and file sharing. The user interface, features and configuration may vary between clients and versions of the same client.

d. During the installation of an Ares client program, various settings are established which configure the host computer to share files. Depending upon the Ares client used, a user may have the ability to reconfigure some of those settings during installation or after the installation has been completed. Typically, a setting establishes the location of one or more directories or folders whose contents (files) are made available to other Ares users to download. This location is commonly referred to as the "My Shared Folder" and in many versions is defaulted to be on the computer's "Desktop."

e. The client software processes files located in a user's shared directory. As part of this processing, a SHA1 hash value is computed for each file in the user's shared directory. The client software processes files located in a peer's shared directory. As part of this processing, a SHA1 hash value is loaded from a prior record or computed for each file in the user's shared directory.

f. The Ares network uses SHA1 values to improve network efficiency. Users may receive a selected file from numerous sources by accepting segments of the file from multiple users and then reassembling the complete file on the local computer. The client program succeeds in reassembling the file from different sources only if all the segments came from exact copies of the same file. The network uses SHA1 values to ensure exact copies of the same file are used during this process.

g. Upon connecting to the Ares network, a list of shared files, descriptive information and the files associated SHA1 values are sent to supernodes. This allows other users to locate these files. The frequency of updating information is dependent upon the client software being used and the Ares networking protocols. This information sent to the ultra-peers (supernodes) is data about the file and not the actual file. The file remains on the user's computer. In this capacity, the supernode acts as a pointer to the files located on a user's computer.

h. When a download of a file is initiated, the user is presented with a list of users ("nodes") who had told the Ares network that they have the requested file available for others to download. Typically, the supernodes' and hosts' computers on the network return this list containing node information and the IP addresses of computers that have reported they have the same file (based on SHA1 comparison) or in some instances portions of the same file

available to others to download. This procedure allows for the detection and investigation of those computers involved in sharing digital files of known actual child pornography.

i. Obtaining files from the Ares network, as described herein, returns the candidate list, including IP addresses, which can be used to identify the location of computers that have the image. Although the IP address is not usually visible to the end user in the common Ares clients, it is returned and used by the software to initiate the download.

j. When a user does not create an account name for ARES, the program assigns an account name starting with "anon_" and adds a combination of 8 letters/numbers based upon the IP address utilized by the ARES user. An example of a generated account name is "anon_6cb28fc4." An ARES user may add, change or delete an account name in the options portion of the ARES program at any time.

k. Law enforcement has modified the Ares program to allow the downloading of a file from a single IP address as well as displaying the IP address which is known to all Ares clients but not ordinarily displayed. Once the law enforcement modified version of the Ares program has been initiated by the investigator, the program seeks and downloads suspected child pornography even without the investigator being present during the downloads.

16. The Internet Crimes Against Children ("ICAC") Task Force Programs under the direction of the Office of Juvenile Justice and Delinquency Prevention, and in conjunction with ICE and the National Center for Missing and Exploited Children ("NCMEC"), maintain a list of SHA1 values associated with files that have been identified by a law enforcement officer as being child pornography related. Not every image in this database technically constitutes child

pornography under 18 U.S.C. § 2256(8)(a), but the images generally all depict sexually suggestive images of children.

17. Exchangeable image file format ("Exif") is data that can be imbedded in digital video and image files. Often included in the Exif data is metadata. Metadata may be written into a digital photo file that will identify the owner, copyright, and contact information; what camera created the file; and possibly exposure information and descriptive information, including keywords about the photo, making the file searchable on the computer and/or the Internet. Some metadata is written by the camera and some is input by the photographer and/or software after downloading to a computer.

## VI. STATEMENT OF PROBABLE CAUSE

### A. Online Investigation

18. In May and June of 2016, I learned that law enforcement officers observed a computer using an IP address of 104.32.158.174 (the "SUSPECT IP ADDRESS") offering multiple suspected child pornography files. I also learned that the Ares nickname for the computer(s) utilizing the SUSPECT IP ADDRESS was "anon_68209eae@Ares." I also learned that the SUSPECT IP ADDRESS was assigned to Time Warner Cable.

19. On or about May 10, 2016, I determined that "anon_68209eae@Ares" was continuing to use the SUSPECT IP ADDRESS to connect to the internet and share files via Ares. I obtained a list of files being shared by "anon_68209eae@Ares." This list contains approximately 47 files that are suspected of containing child pornography because their SHA1 values match images in the child exploitation image database described above in paragraph 16, or because the file names are suggestive of child pornography. I downloaded one of these files from "anon_68209eae@Ares." The file, titled " (pthc-jho-lolifuck) 7 yo tara ass-fucked

doggystyle (sound)(2).wmv," is a video depicting what appears to be a female under ten years old being raped from behind by an adult male. A voice of a girl can be heard on the video saying, "no, that hurt" and "it hurts."

20. On or about May 18, 2016, I used Ares to download another file containing suspected child pornography from Ares user "anon_68209eae@Ares," who was still using the SUSPECT IP ADDRESS to connect to the internet. That file, titled " 2013 pthc - tara takes a shower slidemovie hd.avi," is a video depicting what appears to be a female under ten years old posing naked and performing sexual acts. Sexual acts include performing oral sex on an adult male, masturbating and being urinated on.

21. On or about June 2, 2016, I used Ares to download approximately two files containing suspected child pornography from Ares user, "anon_68209eae@Ares," who was still using the SUSPECT IP ADDRESS to connect to the internet. The following is a description of the two files:

i. "! new ! (pthc) 2007 tara.wmv" is a video depicting a nude adult male in a clown mask sitting on a chair. He orders a girl, who appears to be under 13 years old, to perform oral sex on him. An adult male's voice can be heard on video saying, "that's it bitch. Suck that fucking cock." The adult male appears to penetrate the child's anus with a large foreign object.

ii. "(pthc) 2007 tara 8yr - ass to mouth - february 6th 2008.wmv" is a video depicting what appears to be a girl under ten years old performing oral sex on an adult male. An adult male's voice can be heard saying, "make it hard slut" and "make daddy's cock hard." Later in the video, the adult male engages in anal sex with the minor girl.

**B. Identification of Subscriber of SUSPECT IP ADDRESS**

22. According to reports from Time Warner Cable dated June 30, 2016, November 9, 2016, and November 30, 2016, during the time period that the SUSPECT IP ADDRESS was used to distribute child pornography via the Ares network, the SUSPECT IP Address was assigned to internet subscriber Fernando Garcia at the SUBJECT PREMISES. The internet service was established at the SUBJECT PREMISES on or about March 26, 2012, and was active as of the date of the reports.

23. On or about October 28, 2016, I reviewed a California Department of Motor Vehicles ("DMV") image record for Fernando Garcia dated on or about October 28, 2016. According to the DMV, Garcia's mailing address was listed as the SUBJECT PREMISES.

24. On or about October 31, 2016, I reviewed a National Comprehensive Report ("NCR") records check for Fernando Garcia at the SUBJECT PREMISES. NCR is a report generated by Thomson Reuters – which is a company that consolidates public records, including addresses, driver licenses, property deed transfers, and corporate information, as well as some propriety records. I learned that Garcia was associated with the SUBJECT PREMISES between on or about October 23, 2008, and December 15, 2014.[2]

25. On or about October 31, 2016, I reviewed a Los Angeles Police Department report pertaining to an interview they conducted with Fernando Garcia in March 2005. Fernando Garcia's residential address was listed as the SUBJECT PREMISES.

---

[2] I also learned that Garcia was associated with 229 30th Street E, Los Angeles, California 90011, but only on or about December 25, 2011 and December 26, 2011, and July 28, 2015.

26. On or about January 27, 2017, United States Postal Inspector ("USPI") Eula Toca advised me that Fernando Garcia is currently receiving mail at the SUBJECT PREMISES. USPI Toca obtained this information on or about January 25, 2017, from the post office that covers the area including the SUBJECT PREMISES.

27. Based on the information above, there is probable cause to believe that someone at the SUBJECT PREMISES possessed, and made available for distribution, multiple files containing child pornography.

## VII. EVIDENCE WILL BE FOUND AT THE SUBJECT PREMISES

28. Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a. Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or in other visual media; or from literature describing such activity.

b. Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these

materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. Individuals who have a sexual interest in children or images of children often possess and maintain "hard copies" of child pornographic material – that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. – in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children and maintain hard copies of this material typically retain them for many years.

d. Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the individual to view the collection, which is valued highly.

e. Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/ collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f. Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

**[Instrumentality Protocol]**

29. Further, child pornography received via computer is extremely mobile. Through computer technology, digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto thumb drives so small that they fit onto a keychain. Just as easily, these files can be copied onto floppy disks or compact disks, and/or stored on iPods, Blackberries, or cellular telephones. Because someone at the SUBJECT PREMISES likely collects and values child pornography, which is easily-stored and duplicated, there is probable cause to believe that evidence of a child pornography collection will be found in the SUBJECT PREMISES.

## VIII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

30. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

**[Instrumentality Protocol]**

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials

contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate

the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

31. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime

32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX. CONCLUSION

33. For all the reasons described above, there is probable cause to believe that the evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252A(a)(2) (receipt and distribution of child pornography), 2252A(a)(5)(B) (possession of child pornography), and 2251(d) (advertisement of child pornography), as described in Attachment B to this affidavit and

incorporated herein by reference, will be found in a search of the SUBJECT PREMISES, which is further described above and in Attachment A of this affidavit.

Timothy Alon, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this 6th day of February, 2017.

UNITED STATES MAGISTRATE JUDGE